# **EXHIBIT 1**



**Service of Process Transmittal**
08/11/2017
CT Log Number 531744515

| | |
|---|---|
| **TO:** | Scott Irwin, General Counsel<br>CoreCivic<br>10 Burton Hills Blvd<br>Nashville, TN 37215-6105 |
| **RE:** | **Process Served in Arizona** |
| **FOR:** | CoreCivic, Inc.  (Domestic State: MD) |

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Silverio Deniz, etc., Pltfs. vs. CoreCivic, Inc., etc., et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Pinal County - Superior Court, AZ<br>Case # CV201700941 |
| **NATURE OF ACTION:** | Wrongful Death - May 20, 2015 |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Phoenix, AZ |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 08/11/2017 at 11:09 |
| **JURISDICTION SERVED:** | Arizona |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days from the date of service, not counting the day of service |
| **ATTORNEY(S) / SENDER(S):** | Daniel R. Ortega, Jr.<br>ORTEGA LAW FIRM, P.C.<br>361 East Coronado Road, Suite 101<br>Phoenix, AZ 85004-1525<br>602-386-4455 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  UPS Next Day Air , 1Z0399EX0109378131<br><br>Image SOP |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 3800 N Central Avenue<br>Suite 460<br>Phoenix, AZ 85012 |
| **TELEPHONE:** | 602-248-1145 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

8/11/17
11:09 AM

Daniel R. Ortega, Jr., SBN: 005015
**ORTEGA LAW FIRM, P.C.**
361 East Coronado Road, Suite 101
Phoenix, Arizona 85004-1525
Phone: (602) 386-4455
Fax: (602) 386-4480
danny@ortegalaw.com

*Attorneys for Plaintiffs*

### ARIZONA SUPERIOR COURT

### PINAL COUNTY

| | |
|---|---|
| Silverio Deniz, individually and as the statutory plaintiff on behalf of Elisa Sahagun, Maribel Posadas, Jesus Alexander Deniz, Erick Armando Deniz, and Elisa Michelle Deniz statutory beneficiaries of decedent Juan de Jesus Deniz-Sahagun; <br><br> Plaintiffs, <br><br> v. <br><br> Corecivic, Inc. d/b/a Corrections Corporation of America; InGenesis, Inc.; John Does I-X; Jane Does I-X; Black and White Corporations, Partnerships, and Associations I-X; <br><br> Defendants. | No: CV201700941 <br><br> SUMMONS <br><br> STEPHEN F. MCCARVILLE |

**WARNING:** This is an official document from the court that affects your rights. Read this carefully. If you do not understand it contact a lawyer for help.

THE STATE OF ARIZONA TO:

**CORECIVIC, INC. d/b/a CORRECTIONS CORPORATION OF AMERICA**

1. A lawsuit has been filed against you. A copy of the lawsuit and other court papers are served on you with this *"Summons."*

2. If you do not want a judgment or order taken against you without your input, you must file an *"Answer"* or a *"Response"* in writing with the court, and pay the filing fee. If you do not file an *"Answer"* or *"Response"* the other party may be given the relief requested in his/her Petition or Complaint. To file your *"Answer"* or *"Response"* take, or send, the *"Answer"* or *"Response"* to the Office of the Clerk of the Superior Court, 971 Jason Lopez Circle, Building A, Florence, AZ 85132. Mail a copy of your *"Response"* or *"Answer"* to the other party at the address listed on the top of this Summons.

1

3. If this *"Summons"* and the other court papers were served on you by a registered process server or the Sheriff, within the State of Arizona, your *"Response"* or *"Answer"* must be filed within TWENTY (20) CALENDAR DAYS from the date you were served, not counting the day you were served. If this *"Summons"* and the other papers were served on you by a registered process server or the Sheriff outside the State of Arizona, your Response must be filed within THIRTY (30) CALENDAR DAYS from the date you were served, not counting the day you were served. Service by a registered process server or the Sheriff is complete when made. Service by Publication is complete thirty (30) days after the date of the first publication. Service by registered or certified mail outside the State of Arizona is complete 30 days after the date of receipt by the party being served. Service upon the Arizona Motor Vehicle Superintendent is complete 30 days after filing the Affidavit of Compliance and return receipt or Officer's Return. RCP 4.2(e); A.R.S. § 28-2321 through 28-2327. Where process is served upon the Arizona Director of Insurance as an insurer's attorney to receive service of legal process against it in this state, the insurer shall not be required to appear, answer or plead until expiration of 40 days after date of such service upon the Director.

4. You can get a copy of the court papers filed in this case from the plaintiff/attorney listed at the address at the top of this paper, or from the Clerk of the Yuma Superior Court 971 Jason Lopez Circle, Building A, Florence, AZ 85132.

5. Requests for reasonable accommodations for persons with disabilities must be made to the office of the judge or commissioner assigned to the case, at least five (5) days before your scheduled court date.

**SIGNED AND SEALED this date:** MAY 1 8 2017

Amanda Stanford, Clerk of Court

By: <u>REBECCA PADILLA</u>
Deputy Clerk



ORTEGA LAW FIRM, P.C.
361 East Coronado Road, Suite 101
Phoenix, Arizona 85004-1525
Phone: (602) 386-4455
Fax: (602) 386-4480

Daniel R. Ortega, Jr., SBN: 005015
**ORTEGA LAW FIRM, PC**
361 East Coronado Road, Suite 101
Phoenix, Arizona 85004-1525
(602) 386-4455   (602) 386-4480 (fax)
danny@ortegalaw.com

*Attorneys for Plaintiff*

FILED PINAL COUNTY
SUPERIOR COURT
AMANDA STANFORD

MAY 1 8 2017

## ARIZONA SUPERIOR COURT

## PINAL COUNTY

Silverio Deniz, individually and as the statutory plaintiff on behalf of Elisa Sahagun, Maribel Posadas, Jesus Alexander Deniz, Erick Armando Deniz, and Elisa Michelle Deniz statutory beneficiaries of decedent Juan de Jesus Deniz-Sahagun;

Plaintiffs,

v.

Corecivic, Inc. d/b/a Corrections Corporation of America; InGenesis, Inc.; John Does I-X; Jane Does I-X; Black and White Corporations, Partnerships, and Associations I-X;

Defendants.

No. CV201700941

**COMPLAINT**

STEPHEN F. MCCARVILLE

(Tort Non-Motor Vehicle: Wrongful Death)

Plaintiff Silverio Deniz, for his complaint against defendants, allege as follows:

### PARTIES AND JURISDICTION

1. Statutory plaintiff Silverio Deniz (hereinafter "plaintiff Deniz") is a resident of Mexico and the father of decedent Juan de Jesus Deniz-Sahagun (hereinafter "decedent Deniz-Sahagun") who died on May 20, 2015, in Eloy, Arizona.

2. Plaintiff Deniz and statutory beneficiary Elisa Sahagun, husband and wife, are residents of Mexico and the natural parents of decedent Deniz-Sahagun.

3. Statutory beneficiary Maribel Posadas is a resident of the State of Nevada and the spouse of decedent Deniz-Sahagun.

1

4. Statutory beneficiaries Jesus Alexander Deniz, a minor, Erick Armando Deniz, a minor, and Elisa Michelle Deniz, a minor, are residents of the State of Nevada and the natural children of decedent Deniz-Sahagun.

5. Plaintiff presents this wrongful death claim pursuant to A.R.S. §12-612.

6. The acts and or omissions complained of herein caused events to occur within the County of Pinal, State of Arizona, which caused the death of decedent Deniz-Sahagun.

7. Defendant Corecivic, Inc., d/b/a Corrections Corporation of America (hereinafter "CCA"), is a Maryland corporation doing business in Pinal County, Arizona and at all times relevant herein caused certain events to occur in Pinal County, Arizona. CCA is the largest owner of for-profit prisons and immigration detention facilities in the United States.

8. Immigration and Customs Enforcement an agency of the Department of Homeland Security (hereinafter "ICE") contracts with the City of Eloy, Arizona under an Intergovernmental Service Agreement, which then contracts with CCA to house immigrant detainees at the Eloy Detention Center located in Eloy, Arizona. The Eloy Detention Center (hereinafter EDC") is owned and operated by CCA.

9. Defendant InGenesis Inc., (hereinafter "InGenesis") is a Texas corporation doing business in Pinal County, Arizona at all times relevant herein caused certain events to occur in Pinal County, Arizona. InGenesis provides health care staffing to various facilities throughout the United States of America. Medical care at the EDC is provided by the ICE Health Services Corps which contracts with InGenesis to provide the medical staff at EDC.

10. At all relevant times hereto, the actions, conduct and omissions alleged in this complaint to have taken place were done by one or more of the defendants' agents, employees, servants or representatives, or others who were under their control and

2

direction or were acting within the course and scope of employment, agency, ostensible agency or representative capacity of one or more of the defendants. The acts and/or omissions of the employees of one or more of the defendants are vicariously imputed to said defendants under the doctrine of *respondeat superior*.

11. Defendants John Does I-X; Jane Does I-X; Black and White Corporations, Partnerships, and Associations I-X; are fictitious defendants which caused the events complained of to occur in the state of Arizona and whose names are not currently known to plaintiff. In the event that the true identities of such defendants are made known to plaintiffs through discovery, plaintiffs will seek leave to amend this complaint to set forth the true names and identities of such defendants.

## GENERAL ALLEGATIONS

12. On May 15, 2015, decedent Deniz-Sahagun, a native and citizen of Mexico, was arrested by the United States Border Patrol (hereinafter "USBP") near Douglas, Arizona after having entered the United States of America.

13. Decedent Deniz-Sahagun entered at the Port of Entry and expressed fear that someone was going to kill him.

14. On May 19, 2015, decedent Deniz-Sahagun was interviewed by a Border Patrol Agent (hereinafter "BPA") and charged as inadmissible to the United States under §212(a)(7)(A)(i)(I) of the Immigration and Nationality Act.

15. On May 17, 2015, the USBP transported Deniz-Sahagun to Banner University Medical Center in Tucson, Arizona, after he twice jumped from a concrete bench in a hold room, landing on his head. He told the emergency room physician he was attempting to break his own neck because he feared his life was in danger from Mexican coyotes, as well as the USBP.

16. The attending physician consulted with the social work and psychiatry departments, but was told that neither department could see Deniz-Sahagun because he

3

was in USBP custody. It is unclear whether any discharge summary or medical documentation were provided to the Border Patrol Agents (BPA) escorting Deniz-Sahagun.

17. BPAs took Deniz-Sahagun to the Eloy Detention Center (EDC) and admitted on May 18, 2015.

18. An RN in the booking area stated that BPAs told her that Deniz-Sahagun had been taken to Tucson Medical Center after jumping from a bench in the Border Patrol hold room, and that he had been observed banging his head against a wall at the Border Patrol Station and behaved erratically during his transport to EDC. The BPAs reportedly said that Deniz-Sahagun had been saying that the cartel was after him and intermittently becoming agitated, then calm.

19. The RN stated that she attempted to talk with Deniz-Sahagun, but he gave no coherent answers, and that he appeared anxious and fearful of the cartel. The RN informed an InGenesis RN responsible for intake screenings that she should refer Deniz-Sahagun for mental health evaluation. The intake RN stated that she did not recall the other RN sharing any observations about Deniz-Sahagun's mental health or about his erratic behavior during transport.

20. During the pre-screening interview at 9:42 a.m., Deniz-Sahagun initially answered "no," when asked, "Are you afraid that someone is going to hurt you?" and "Do you want to hurt yourself?"

21. During the full screening, however, Deniz-Sahagun reported that he was taken to a hospital the previous day after throwing himself off a table to try to kill himself, and stated that he wanted to break his neck and die because his life was threatened. He then indicated that he felt safer at EDC and no longer wanted to kill himself.

22. At 2:29 p.m., Deniz-Sahagun was placed in Delta Unit, cell 514, after intake and clearance for general population by medical staff.

4

23. At 9:56 p.m., Deniz-Sahagun was transferred to Echo Unit, cell 103, after requesting protective custody because he believed his cellmate was going to kill him. Upon an interview the next day, the cellmate reported that Deniz-Sahagun talked about how a radio cord could be used to strangle someone.

24. On May 19, 2015, at 9:30 a.m., a Sergeant and Case Manager arrived to interview Deniz-Sahagun. They reported that he was uncooperative and refused to answer questions. The Sergeant and Case Manager terminated the interview because Deniz-Sahagun continued to refuse to answer questions and then started escorting him back to his cell. Deniz-Sahagun panicked and attempted to run out the main door of Echo Unit. He complied with orders to return, face the wall and place his hands behind his back.

25. As he was handcuffed, Deniz-Sahagun attempted to break way toward the Unit's door again, and the Case Manager and Sergeant decided they needed to take him down to the ground to gain control of him, at approximately 9:47 a.m. The Sergeant and a Unit Manager easily regained control of Deniz-Sahagun, but he repeatedly screamed that the cartel was after him and wanted to kill himself. Deniz-Sahagun was then escorted to medical unit for a medical examination.

26. During the examination, the RN interviewing him stated that Deniz-Sahagun was initially calm but became agitated after several minutes, and he refused to answer any of her medical questions or allow her to examine him. When the RN directed officers to take him back to segregation, he became physically resistant. As offices place him on the floor to control him, he screams "They want to kill me." An RN in the clinic reported that Deniz-Sahagun yelled and screamed that the cartel was coming to kill him.

27. A doctor in the clinic heard his screams and asked to speak with Deniz-Sahagun in Spanish, but Deniz-Sahagun kept screaming. The doctor told a nurse that Deniz-Sahagun likely needed a medical health referral, placement on suicide watch and

5

medication to calm him down, but did not offer any medication. He stated that any medication administered would have to be done involuntarily.

28. After a third use of force incident occurred, medical and security staff, including the Unit Manager discussed Deniz-Sahagun during a regular morning meeting. The Unit Manager emphasized to the group that Deniz-Sahagun seemed very unstable and needed to be seen by mental health. Deniz-Sahagun was returned to his cell in Echo Unity at approximately 10:02 a.m.

29. A doctor arrived later to evaluate Deniz-Sahagun in his cell and determined that he suffered from delusional disorder, noting reports that Deniz-Sahagun had reportedly attempted suicide while in USBP custody. He determined that Deniz-Sahagun should be considered a potential danger to himself and others and placed on suicide watch.

30. The doctor ordered suicide watch from May 19 to May 26, 2015. He also noted a request for facility physicians to be prepared to order emergency psychiatric medications, and recommended to another physician that involuntary psychotropic medications be administered.

31. A team assembled at 12:11p.m. to remove Deniz-Sahagun for suicide watch. Officers carried Deniz-Sahagun to his cell in Bravo cell 603.

32. At 1:26 p.m., a medical emergency is called when an officer reported Deniz-Sahagun was hitting his head on the sink in his cell. During her interview with an RN, Deniz-Sahagun claimed he was not hitting his head, but leaning over the sink to drink water. The RN spoke with a doctor via telephone after the encounter to request an immediate mental health assessment.

33. At approximately 1:55pm, the doctor ordered psychotropic medication to be administered via injection at that time, with an additional dose to be administered at bedtime.

6

34. At approximately 2:20 p.m., a response team assembled to administer the anti-psychotic medications. An HSA was concerned about administering the medication involuntarily, because Deniz-Sahagun was now calm. The HSA expressed her concerns to the doctor, who cited Deniz-Sahagun's erratic behavior throughout the day and the HSA reluctantly agreed to have a nurse administer the medication.

35. Despite the doctor's orders and agreeing to administer the medication, the HSA decided it was not appropriate to administer the medication after tan RN reiterated that Deniz-Sahagun had been calm for over an hour. The HSA did not confer with either of the physicians, and they were not aware that the medications were not administered.

36. The medical record does not document that the medications were not administered, nor was there any attempt to gain Deniz-Sahagun's consent to take the medication voluntarily.

37. On May 20, 2015, the following occurred at EDC:

A. At 8:08 a.m., Deniz-Sahagun was escorted to an office to see a physician, for an examination.

B. The physician diagnosed Deniz-Sahagun with brief reactive psychosis after an interview, but stated that he believed that Deniz-Sahagun appeared stable and was no longer a danger to himself. Notably, the physician did not perform a thorough mental health psychosocial exam and did not complete the IHSC's suicide risk assessment form. Additionally, the physician was not aware that the prescribed anti-psychotic medications had not been administered.

C. At 8:47 a.m., the physician electronically signed an order removing Deniz-Sahagun from suicide watch and placed him on mental health observation status, allowing him normal clothes, hygiene supplies, bedding and meals. Security checks were to be performed every 15 minutes.

D. At 2:30 p.m., staff removed Deniz-Sahagun from his cell and escorted him to the shower.

E. At 2:52 p.m., officers placed a bedroll containing two sets of clothing and a mattress inside Deniz-Sahagun's cell. Deniz-Sahagun returned to his cell at 2:53 p.m.

7

F. A food tray was delivered to Deniz-Sahagun's cell at 4:22 p.m. and Deniz-Sahagun placed the tray on the open trap at 4:35 p.m. for pick up.

G. At 5:04 p.m., an officer passed a toothbrush and tube of toothpaste through the food trap of Deniz-Sahagun's door.

H. At 5:27 p.m. an officer looks in Deniz-Sahagun's cell and knocks on the door, before opening the trap and calling out to Deniz-Sahagun.

I. The officer calls a medical emergency at 5:28 p.m.

J. The officer waits for additional officers to respond. At 5:32 p.m., the cell was unlocked and a Sergeant opened the cell door slightly. The Sergeant stated that he "could see Deniz-Sahagun's back rising and he heard gurgling and labored breathing."

K. A Licensed Practical Nurse (LPN) and an RN from InGenesis arrived at 5:33 p.m. and an IHSC Lieutenant Commander and a Physician Assistant then arrived. The LPN, RN and RN stated that they observed Deniz-Sahagun lying face down and unresponsive.

L. At 5:34 p.m., officers open Deniz-Sahagun's cell and they take hold of Deniz-Sahagun. A Sergeant stated that he observed saliva and foam coming from Deniz-Sahagun's mouth and the RN documented that Deniz-Sahagun's face was blue and swollen. In the RN's interview, she stated it was obvious that his airway was blocked. Similarly, the PA recognized that Deniz-Sahagun would die "very soon" if they could not clear his airway.

M. After checking Deniz-Sahagun's airway and having officers remove his handcuffs, the PA initiated CPR and hooked up an external defibrillator.

N. At 5:38 p.m., staff directed officers to call 911.

O. At 5:47 p.m., an ambulance arrived on site.

P. At 5:52 p.m., paramedics arrived and attempted to resuscitate Deniz-Sahagun.

Q. At 6:09 p.m., a doctor from Banner Casa Grande Medical Center declared decedent Deniz-Sahagun dead.

38. The autopsy report indicated that an orange sock was impacted in Deniz-Sahagun's throat, causing him to asphyxiate. A nine-centimeter toothbrush with the word "China" inscribed on it was also found inside his stomach. Photographs taken of

8

the cell include images of a single sock in the cell and the wrapper from a toothbrush. A new toothbrush obtained from EDC also had the word "China" inscribed on it.

## COUNT I

### (Negligence and Gross Negligence)

39. Plaintiff hereby incorporates all preceding paragraphs by reference.

40. Defendant officers' negligent, grossly negligent, careless and reckless actions, conduct and omissions include, but are not limited to:

   A. Failing to document Deniz-Sahagun's attempts to commit suicide at the Border Patrol Station, as well as his erratic behavior during transport to EDC.

   B. Failure to document Deniz-Sahagun's statements during intake that he had attempted to kill himself in USBP custody and that he feared that he would be killed by the cartel.

   C. The failure of physicians observing Deniz-Sahagun's erratic behavior in the clinic to inquire about his status, including any known mental health history, nor consider whether placement on mental health observation would be more appropriate than returning him to segregation.

   D. Failure to adequately elevate the level of Deniz-Sahagun's treatment to his symptoms.

   E. Failure to provide a thorough evaluation by a psychiatrist.

   F. Failed to obtain consent for the administration of prescribed anti-psychotic and anti-anxiety medication when their involuntary administration was not appropriate

   G. Failure to consult with physicians or mental health providers in the decision not to administer prescribed medication.

H. Failure to document that the prescribed medications were not administered.

I. Failure to perform a required suicide risk assessment addressing all required factors prior to removing Deniz-Sahagun from suicide watch.

J. Failure to provide mental health providers on call to respond to the needs of the detainee population 24 hours a day, seven days a week, as required by policy.

K. Failure to review medical records either before or after a medical clearance assessment.

L. Failure to medically evaluate Deniz-Sahagun prior to his placement in Echo Unit.

M. Failure to develop a Suicide Prevention Plan, contrary to CCA Policy 9-19.

41. Defendant's negligent, grossly negligent, careless and reckless actions, conduct and omissions were both the direct and a proximate cause of the wrongful death of decedent Deniz-Sahagun.

42. As a direct and proximate result of the negligence, grossly negligent, careless and reckless actions, conduct and omissions of the defendants, statutory plaintiff Silverio Deniz and the statutory beneficiaries Elisa Sahagun, Maribel Posadas, Jesus Alexander Deniz, Erick Armando Deniz and Elisa Michelle Deniz, suffered the loss of decedent Deniz-Sahagun.

43. As a further direct and proximate result of the death of decedent Deniz-Sahagun, plaintiff and the statutory beneficiaries have suffered, and will continue to suffer, damages from the loss of support, love, affection, companionship, care and

enjoyment. They have further suffered, and will continue to suffer, pain, grief, sorrow, anguish, stress, shock and mental suffering.

## COUNT II

### (Negligent Supervision and/or Training)

44. Plaintiff hereby incorporates all preceding paragraphs by reference.

45. Defendants were negligent in failing to train and supervise, or otherwise control defendants' agents, employees, servants or representatives, or others who were under their control.

46. As a direct and proximate result of the negligence of defendants the plaintiff and the statutory beneficiaries were damaged as set forth above.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this court grant relief against defendants as follows:

A. For special damages in an amount to be proven by the evidence;

B. For general damages in an amount to be proven by the evidence;

C. For plaintiffs' costs incurred herein; and

D. For such additional damages and relief as the Court deems justified by the evidence.

DATED this 17th day of May, 2017.

ORTEGA LAW FIRM, P.C.

By: *[signature]*
Daniel R. Ortega, Jr.
361 East Coronado Road, Suite 101
Phoenix, Arizona 85004-1525
*Attorneys for Plaintiffs*

**ORIGINAL** of the foregoing was filed this 18th day of May, 2017:

11

1  Clerk of the Superior Court
2  Arizona Superior Court in Pinal County
   971 Jason Lopez Circle, Building A
3  Florence, AZ 85132

4

5  By _K. Morgan_

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

ORTEGA LAW FIRM, P.C.
361 East Coronado Road, Suite 101
Phoenix, Arizona 85004-1525
Phone: (602) 386-4455

12